Rain Computing, Inc. v. Samsung Electronics Co., Ltd. Mr. Alex Pritchett apparently is a clerk to one of the judges. We note this and understand that the judges have seen this and will proceed with their due diligence on this. We respectfully would like to talk about... One of the judges on this panel? Yes. Are you making a motion for recusal? No, we're not. We're just noting that that is the case and we trust the judges to fully appreciate that fact. So this is someone who worked on the case when it was in the district court? Yes, that's correct. Again, I don't want to make an issue, but just to note that's for my clients. Well, what you were saying is you are not making a motion, so there is nothing before the court or any judge sitting on this panel. That's correct. Please proceed. Ms. Fonda, please stop the clock again. The reversal that we seek is based upon the failure of the district court to actually address each of the points that its own case recited at Appendix 17, the Edwards case, as well as the lack of clear, unmistakable, and unambiguous disavowal of the claim scope in adding a negative limitation to the scope of the claim. A review of the specification shows how the dichotomy accepted by the district court between unlimited and on-demand licensing is false and led to its erroneous construction. The background of the 349 patent reviews several types of application delivery software, where often some application software is installed or pre-installed on a computing device. It states that there are many license types other than the unlimited time licenses, only one of which was the on-demand license, which is mostly applicable to web applications. This belies a strict dichotomy between unlimited versus on-demand licenses. The web-based approach to on-demand licensing was how Samsung characterized all on-demand licensing. Quote, when we're done, turn the machine off and the application is gone. Close quote. That's Appendix 1753. Counsel, this is a stipulated judgment for non-infringement, correct? That's correct. Based upon the... And it's based upon the construction that you're objecting to, and that involves the executing step, right? That's correct. And whether it's executed only on the client terminal device, right? That's right, but the judge added what Samsung wanted, which was to say that at the same time that it's executed on the client device on the operating system rather than over a web-based system, that this also requires that the downloaded application was not stored in some way in the client device. Well, that's what the claim says, which requires executing by a processor using the sources of an operating system resident in the memory of the client terminal device. Right, but that says nothing about whether the downloaded application is also in the downloaded device. The additional limitation is a negative limitation that is actually not the case even in these web-based browsers. And certainly, the distinction of how this claim actually works actually gets away from the web-based approach, which if you take the connection off from the web, the application is gone. I think that that's the negative limitation that was added by the district court at Samsung's behest. What about the distinction of Kirkland? This is Judge Dyke. What about the distinction of Kirkland during the prosecution, which seems to say that Kirkland's distinguishable because the application is stored on the client device? Well, that's not actually what that argument was said in Appendix 213 to 217. It simply said Kirkland should not be combined with cover because that would require modification of Kirkland, one, rendering it unsatisfactory for its intended purpose, and two, it would change its principle of operation. So the supposedly disclaiming language only addressed those arguments. And if you look at a quote at Appendix 215, it talks about the proposed modification would render Kirkland's system unsatisfactory for its intended purpose, at least because Kirkland's software applications, e.g., web browsers 460 and Media Player 470, are all resident on a client device. And second, such modification would change Kirkland's principle of operation, at least because no software application is stored in Kirkland's media server device. And there's no reason to control access of Kirkland's software applications resident. So these arguments were about modification of Kirkland to fit into cover. It did not compare any of the 349 inventions, much less clearly, unambiguously, or unmistakably disclaim any aspect of the 349 claims. Now, I understand that this report drew from that, that this was how Dr. Chang distinguished Kirkland on the basis of software applications. But this language was selectively quoted and did not say anything about the 349 invention, much less disclaim anything about it. It was simply that Kirkland could not be modified the way that the examiners suggested. Do you want to proceed or do you want to talk about the cross-appeal? Well, I reserve that time to listen to the cross-appeal first. But in any case, thank you. We'll save that for rebuttal. All right. We will save the remainder of your time. Thank you, Don. Mr. McKeown. Yes, good morning. Mike McKeown for Samsung. May it please the court. The district court correctly held that in light of what the court itself characterized as a compelling weight of the intrinsic evidence, the executing step of the claims must be done with local processing and operating system resources, but without installing the software application packages on the client device. And we indeed agree that it is compelling. And if you look at the specification, it's consistent in its characterization of where the software application packages are installed. The abstract twice indicates that the software applications are installed at the server. The two embodiments in the summary of the invention clearly describe that the software application packages are installed at the server. And every instance in the detailed description where it deals with this subject of where the applications are installed, it's specific that it's installed at the server. And, of course, in the figures, the only place that you see where it's installed is this AP server, which is at the service provider side of the system. Very consistent. And, of course, the fact that it's installed at the server and not the client is consistent with the objectives that are described in the patent. The first, of course, is the on-demand versus the unlimited license. And if we start a column of 1, line 36, we have a description saying, a single machine with an unlimited use is very costly. And then at the end of the specification, at column 6, line 45, it repeats this saying, hey, this invention, there's no need to pay a large fee, quote, unquote. And the only way that's described in this patent for preventing a user from using software for an unlimited time, the only way it's described is having the software installed remotely on a server, verifying the user's subscription each time the user's device is powered on, and allowing the user to receive and run the software only after the description is verified, and then releasing the software. And in figure 3 of the patent, it ends this whole process with terminating the application package. It's very consistent. And the other objective that's cited and referenced in the specification is the storage space saving. And at column 5, line 44, for example, it talks about having freeing up storage at the client device because we are storing the software applications at the server side of the system. And if that wasn't clear enough, the prosecution history we submit ends the matter. Judge Dike referenced the Kirkman rejection, which this is what the examiner striked at. This is what the district court relied on at appendix A21. And what happened here was a rejection was lodged by the examiner over a combination, one reference called cover over Kirkman. And the examiner cited what was described in Kirkman as an authentication device and equated that with the user identification module. And the inventor here said that's no good. The inventor agreed that Kirkman disclosed software packages. One of the examples of that was streaming media player. But then in the prosecution specifically, the inventor argued that these software packages were included on the client, not the server. Therefore, they can't possibly satisfy the requirement that we have a device configured to control access to software application packages because they're already stored at the client side. And, of course, that's the distinction that the district court correctly relied on. And that, under this court's precedent, is a disavowal, a clear disavowal. Where in the JA is that disavowal? Where can I find it? That's at A731, Your Honor. Specific rejection. And the cases we cite for the fact that the examiner may have not specifically relied on that is the Fenner case we cite and the Cordish case we cite in our brief. But I will say that this Kirkman... Where is the sentence that you think is the strongest on 731? 731, Your Honor, if you go down to the paragraph that begins, Kirkman does not disclose that the authentication device... This is the second paragraph, complete paragraph. It says, Kirkman does not underline, disclose that the authentication device could be configured to control access of one or more software application packages that are highlighted. And again, citing the streaming media player 470. And then here's the sentence that the district court relied on. Moreover, Kirkman clearly discloses that the web browser 460, streaming media player 470, and other software application packages are included in the client device, not, again, underline not, in the streaming server. And then it goes on to say, therefore Kirkman doesn't suggest the combination. So that is compelling disavowal. It's right to the heart of the debate that we're having here. And, of course, it's consistent with every single discussion of where the software applications are stored in the specification. There's also other sources of prosecution history. There was a, at A289, an interview summary that the inventor had with the examiner. And Dr. Chang, in the interview, specifically stated that the use of server-based applications while accessing and utilizing the permanent storage unit of the server, stressing that this is server-based system and the applications are stored at the server. So we submit that that prosecution history, combined with the intrinsic record in the specification, compels the conclusion. And the claim itself, to be sure, it doesn't say you're not installing on the client device, but the claim itself is set up very consistent with the specification where you have a system based on user demands. And whenever a user wants to execute a software application package, they must authenticate a subscription, and then and only then will the software application package be transmitted to the client for local execution. The transmission is happening from the server to the client, and that needs to happen every time you want to have an execution. Is it your view that the plain language of the term server-side storage, or is it your view that there was a disavowal that otherwise alters what would normally be the plain language? Because usually disavowal cases like this are to overcome the plain language, but I'm understanding your argument right now to be that the plain language isn't even what I think it is, which is a client terminal device. No, I think it is the client terminal device, just for the reasons I've stated. Look at the entire structure of the claim. When you get to the executing step, you necessarily have downloaded, that was transmitted from the server. So it's very consistent with the intrinsic record. So that's the point I'm making, Your Honor. I don't think this is something that's not addressed in the claim. I think the context of the claim supports the district court's conclusion that we're not talking about executing applications that are installed at the client side. If we don't agree with you, you've got to cross-appeal. Yes, Your Honor, and thank you for mentioning that. Let me shift to that, if I may. Well, the district court started off on this issue on the right track, we believe. The user identification module was identified as a 112.6, and the court correctly identified the corresponding function, which was to control access to one or more software application packages. But when the court went to the job of looking to the specification to find the corresponding structure that's clearly linked, this is where we think the errors occurred. What the court did here, the corresponding structure that the court was looking for was the storing of subscription information. And what we know from the court's own holding is that the structure that you need to find is to control access. And the court went on to say that any hardware capable of storing information would do. But storing is not what the claim requires. The claim is specific here. It's to control access. That's the function. If it was a claim for storing, then we wouldn't be here on this point. But the claim is clear here. In fact, it was amended to say capable of, and it has to control access. And this is where we think the court was set astray. Only by reading out the control access function and replacing it with a storing information, storing subscription information, could the court find corresponding structure. And, you know, it's not surprising the court couldn't find in the specification any kind of function to control access, any kind of structure to do that, because control access is not even described in the specification. It's nowhere. So there's no structure in the specification that's identified to control access. And certainly not the user identification device that the district court pointed to. But beyond that... This is Judge Teige. If I understand correctly, they're arguing that the control access feature is somehow described in the claims themselves. Is that...? What do you understand their contention to be about where the algorithm is? Well, I'm not clear, to be honest with you, Your Honour. I think they point to the general steps, and based on the general steps of the claim and the general steps described in the specification, that holistically this is controlling access. And they point to figure 3, for example, that goes through those steps. But the court's case law is very clear, and we cite the Augmet case in our brief, that you can't go to general steps. You've got to go to the specific part that deals with the function that you're debating, and then take that and go look for the corresponding... The district court said... Counsel, what the district court said, because the sole access control mechanism is the request and retrieval of the user's subscription information, the court agrees with Samsung. What do we do with that? Well, I think what happened there, the court conflated different steps that was going on there. We have the... In the claim, there's the sending to the user a user identification module, and that's, of course, the step we're debating here. Then the separate step is the server device authenticating the user by requesting subscription information. That's the step that deals with authentication, and that's wholly separate from the step that deals with the user identification module. I think what you're saying, this is Judge Dyke, is that the server device that is described as doing the authentication is something different in the claim than the user identification module. That's exactly right, Your Honor. Judge Lurie said it much better than I did, but that's exactly the point. Something that's a separate step in the claim. Judge Lurie, with your permission, I'd like to ask a slightly different question. I know his time's expired, so I don't want him to lose all his rebuttal time. Is that okay? That is fine. Okay. So one of the questions I have for you, Mr. McKeon, is Dr. Chang's brief suggests, and I think it's fair to say, that multiple examiners during prosecution refused to look at this element as a 112.6 element. Your argument on appeal fails, does it not, if this is not a 112.6 element, because if it's not a 112.6 element, we don't need an algorithm in the spec. Is that correct? Well, let me just, first point, before I directly answer, the district court said any hardware would do, and instead of really pointing to the specific hardware that's at Column 4 of the patent, and then there was no identification about controlling access. So we think the algorithm... Counsel, that seems to be you arguing that a non-means-plus-function term nonetheless needs to identify hardware in the spec, and I just, with all due respect, I think that's probably not a good use of your time, because that's not right, you know? Yeah, no, if it's not means-plus-function, Your Honor, obviously then it's a different analysis, but the patent office, if you look at the patent office, the record on this, the examiner was under the, we think, incorrect conclusion that if it's a method claim, then means-plus-function doesn't apply unless you use the step of language, and this court's precedent, we said the media rights case, for example, makes clear that that's not true. I have to say, this sort of baffled me, because it's just an argument I've never seen before, but yet there it is sort of materializing itself in the MPEP, this means-for versus step-for in a method versus a structure claim, and I know you pointed to a couple of cases where it appears to be similarly situated, but I looked in those cases, and this particular argument wasn't raised about it's not a means-plus-function language because it would have to say step-for, not means-for. It wouldn't be structural. It would be a processing or a step. So what do we do with that? I've just never heard this step-for versus means-for argument made before, and it sort of caught me off guard, and I think your characterization, by the way, of why the examiner said it's not 112.6 is right, and so if we move beyond the step-for versus means-for distinction, I think they lose, but what is there to that distinction? Because it's just not an argument I've ever seen before. Well, I mean, you know, the MPP, of course, governs what they do in the patent office, but I would say that this court's precedent, you know, overrides that, and, of course, this is an issue of law for the court in terms of how it applies. Yeah, but our precedent can't override it if the issue wasn't raised, right? I mean, the fact that we held in a case where no one raised the argument, you know, that that was a means-plus-function language when no one raised this argument doesn't sort of bind us today because it's a new and different argument that just wasn't considered by that prior panel, so it can't bind us. So I guess I want you to go to the heart of the argument. Is there anything to this step-for versus means-for distinction that the patent office has, you know, codified in its MPP? I would say no, Your Honor, and the reason for that, of course, is that if you're invoking the benefit of the statute, even if it's a method claim and you don't use the step-for language, but if you're otherwise invoking the benefit of the statute to rely on the structural part of that, then it applies, and that's really the issue here. You know, as you know, the history behind the statute was a trade-off, a benefit of going to the specification and relying on the disclosure instead of having to, you know, claim these specific structures, and they did that here. I mean, if you agree that it's a 112-6 in terms of the lack of structure in the claim itself, it's all functional, then if you agree with that, then they've invoked it, and you don't need to get to this question of step-for versus means-for. Is that argument made before the district court about the necessity for step-for language? I don't recall that, Your Honor, coming up. I'm sure my able opposing counsel will discuss that, but I don't recall that ever coming up as a specific argument raised by anybody. Well, a step relates to part of a method, whereas means relates to part of a structure. That's pretty clear, and I believe we've written it. Aside from the fact that that's what the statute said, I think we've tracked that in at least one opinion years ago. Yes. Your Honor, I certainly agree with that. That's the distinction in the case law as well. Right. All right. We'll save your three minutes for rebuttal. Thank you, Your Honor. I'm across if there's something to respond to. Let's go back to Mr. Trout, who has at least seven minutes further. Thank you, Your Honor. I'd first like to get back to the original view that there's a major distinction between the dichotomy that is advanced by Samsung of unlimited license versus on-demand license. Counsel, this is Judge Moore. You have limited time, and I understand your arguments on your appeal, but I really want you to address Samsung's cross-appeal on indefinite. Yes. Can you please start there? Okay. I'd like to get back on this difference, and we have raised it, but there are each of the examples. If this is a mean-plus function claim, where is the algorithm? Well, if I may, the algorithm is given within what the judge looked at in terms of the ability to record the information and retrieve the information, and that's essentially the... Are you saying that the algorithm is in the claim itself Yes, it is. If I may, I would say that when this language is added in the first originally, that it was not directed to doing what is anticipated in 112 paragraph 6, and that the words here, configured to control access of, were provided not to avail of a shortcut, but were made in the sense of adapted to or designed to specify the role... Counsel, counsel, I need you to stay focused on Judge Dyke's question, though. You didn't answer it. You sort of answered it, but didn't say where and how. I understand your argument is that you don't think this should fall under 112.6, and therefore you don't need to disclose an algorithm, but Judge Dyke's question, I think, is important. If we don't agree with you on that, and if this is a term that invokes 112.6, precisely where is the algorithm that would be necessary? And his question is, is your argument that that algorithm is contained within the claim language itself? And if your argument is, I think yes is how you answered him, then tell me where. Tell me where precisely in the claim language I am to find the algorithm that explains to you how to control access. I think the judge pointed correctly to the fact that applying 112.6 to define the structure, and the judge did find that the structure was disclosed in the hardware applications that were in the specification. But in terms of what the component, which of course is part of this idea of a nested component, that's 112.6, which appeared in a number of the cases.  as cases where basically the component didn't have any kind of structure other than in the specification, or maybe not even in the specification. But the point is that the judge did find that 112.6 in terms of structure was shown in the hardware structure. I'm really not understanding what you're saying. Here in claim one, it talks about the user identification module doing certain things, but when it comes to the authentication function, it doesn't describe that as being done by the user identification module, but rather by the server device, right? It has a role, the identification device has a role in that authentication. If we look at the specification, there's nothing special that says that the user identification device itself does the authentication. It has a role in it. If you look at the, there's nothing that says that in addition to the claim steps, which are more than just a statement of function, so what does a step of authenticating, it sets very specific things with respect to the user identification device. Okay, so again, counsel, this is Judge Moore. Like Judge Dyke, I'm having trouble understanding the answer to your question. You seem to keep wanting to go back to, and I promise we will give you time to tell us why you don't think this is a 112.6 claim term. But if it is a 112.6 claim term, where is the particular structure, where is the algorithm, which will control the access? That's what I want to know, not storage access. Where is the control access algorithm? It is part of the control access, as I was saying, the language, I would say, is not 112. Well, it's not solely 112.6. It is partly 112.6. Okay, counsel, I guess I'm going to tell you right now that I am going to accept, for my purposes, that you can't point to any structure and that if we do conclude this is in fact 112.6 language, then you lose and your claim is indefinite. Because I think, you know, I couldn't find anything in your brief, and I believe Judge Dyke and I have now asked you this four separate times, and you keep wanting to retreat to this just isn't 112.6, and that's fine. And if you're right on that, you don't have to worry about it. But I want you to know that you haven't answered our question at all. Your Honor, it's 112.6. The structure is the hardware device that is capable of storing the subscription information. The judge correctly noted that the algorithm for doing that is not required to be specified specifically because it's not a general purpose computer as such, and it's known how that component operates. Okay, so that's okay. Now I finally understand your response here. Your response is there is no algorithm because you don't think one was necessary. Your Honor, the judge was saying, and we agree, that the algorithm doesn't necessarily have to be disclosed. The structure is disclosed. The algorithm are known ways of various storage devices for recording and for retrieving, and that's what the judge noted, and that the ultimate issue was looking at nautilus. Your Honor. Can you tell us why you think that this, why the examiner was correct, why we should adopt the rationale in the MPEP that only a claim that implicates a step four, since this is a method claim, could implicate 112.6, and that therefore this isn't even something that falls in 112.6? I promised you you'd get a chance to address that, so I want you to go ahead and do that now. Your Honor, again, we looked at what was intended in 112.6, which was if someone used this as a shortcut for not disclosing the steps or not disclosing the structure, that 112.6 referred to what's actually in the specification plus equivalence. And we believe that 112.6, the intent is actually addressed by this. So normally one looks at, in a method claim, one looks at the steps, because that's what the statute actually says, that you look at it as a shortcut for a combination of steps or a combination of components. And the idea of this nested application, nested 112.6, which really was in only two cases here, and the two cases actually did not disclose how the step was done or this particular structure. Here we do have a structure, and a judge pointed to that structure, and the judge addressed the issue of whether that particular component needed to do anything more than to do identification by itself, because the identification is done, I'm sorry, the authentication is done by certain features of the component that was decided in the claim. And I think that that's what we're addressing, and it's not simply that this component does everything. The specification doesn't say that the component does everything. In fact, the specification says that it's part of certain steps. So, again, yes. Thank you, Mr. Chau. Mr. McKeon has three minutes for rebuttal on the cross-appeal. Thank you, Your Honor. Just a couple of points I'd like to make. On the question of what structure we need to identify, of course, it's limited to the step at issue here, which is sending to the user a user identification module configured to control access. So, therefore, if, in fact, the court agrees with the district court that it's 112.6, the algorithm we need to find is for that particular step. And the idea that we're going to go look for the rest of the claim or go look for the general overview of steps, we just think that's improper. You've got to locate an algorithm for that particular claimed element, and it's got to be an algorithm, of course, that controls access. Well, counsel, counsel, counsel, we could definitely look in the rest of the claim. The claim is part of the spec, and the statute says you look to the spec, and the claim is part of the spec. So if the structure were contained within the claim, that would satisfy it. Will you please, instead, talk about this step 4 versus means 4 argument? I just had never seen this before. I see it now in the MPEB quite clearly, and perhaps it's wrong. Perhaps there can be a means 4 element within a method claim, and that's what you're arguing here, because you're not saying this is a step 4, right? That's correct. But this is within a method claim, nonetheless. So you're arguing there can be a means 4 implication within a method claim, correct? That's correct, Your Honor, and again, the case law is clear on that. I mean, we cited the Media Rights case, which actually used the means 4 language explicitly. But what about the MPEB? Is the MPEB just wrong? Do we need to make it clear that that's wrong, or can it be reconciled with your argument? Well, I don't know that the court needs to go that far in the sense that the step 4 language is not used here in this instance, so I don't think the court needs to go that far. But counsel, this examiner said that this claim term doesn't include 112.6 because it doesn't fall within the step 4 rubric. This examiner said, citing the MPEB, that that was why this is not a 112.6 term. So what, you know, something has to be corrected, right? For you to prevail, I have to tell the PTO, or at least tell this examiner, that either his interpretation of the MPEB is wrong, or what? How do we address the examiner's conclusion in this case? Because it wasn't just one examiner, right? This went up the chain through a primary and everybody else, and they all sort of signed off on this concept. So what do I do with that? If you're right, that has to be wrong, correct? Well, Your Honor, I mean, at bottom, I think you're right. There's clearly a conflict between what it says there in the MPEB and this court's precedent. Has our court ever addressed that MPEB section, or this argument, this argument which distinguishes between step four and means four in the method claim context? I'm not aware, Your Honor, certainly not in the cases we've dealt with in this appeal, it's not addressed that specifically. You know, the court has, like as you said before, we don't know, I don't know if it's ever been argued specifically before the court, or at least it hasn't been addressed in your decisions that we're aware of. But your point, counsel, Judge Lori speaking, your point is that even though this is a method claim, the key part of it is module, which is means, and therefore it makes it means plus function requiring corresponding structure and algorithm. That's exactly right, Your Honor. They've invoked the benefit of the statute, therefore the statute applies. And if the MPEB is wrong, saying there can't be a means plus function, a means portion in a method claim, that's just plain wrong. Well, it would be, of course, this court decisions override that, so obviously it would be incorrect and inconsistent. That's correct. Okay, my time's up. Unless there's any other questions, I will submit the case. Thank you, Mr. McKeon, and Mr. Chau, the case is submitted. Thank you. Thank you. Thank you. The honorable court is adjourned until tomorrow morning at 10 a.m.